NOT FOR PUBLICATION

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| WILLIAM J. KIGGINS JR., : | |
| Plaintiff, : | Civil No. 18-10604 (RBK/JS) |
| v. : | **OPINION** |
| HADDON TOWNSHIP, *et al*., : | |
| Defendants. : | |

**KUGLER**, United States District Judge:

This matter comes before the Court upon Defendants' Second Motion for Summary Judgement (Doc. 28.) For the reasons stated herein, the Motion for Summary Judgment is **GRANTED**.

**I.     BACKGROUND**

Plaintiff is William Kiggins, an individual residing in Rohrer Towers, a senior citizen apartment complex located in Haddon Township. (Doc. 28-2, "Defs. Statement" ¶1.) Defendants are (1) the Haddon Township Housing Authority ("HTHA"); (2) Joseph Iacovino, the Executive Director of the HTHA; (3) Patsy Coyne, the manager of the HTHA; (4) Ellie Connell, a manager of the HTHA; (5) Mark Stevens, the Maintenance Superintendent of the HTHA; and (6) six members of the Board of Commissioners governing the HTHA, including Alma Zwick, Douglass Wallace, Frank Jackson, Rosa Tanzi, Mary Berko, and Brian Seltzer. The HTHA is a public housing authority that operates Rohrer Towers. (*Id.*) Rent at Rohrer Towers is subsidized by the Federal Department of Housing and Urban Development ("HUD"). (*Id.* at ¶2.)

In 2005, Mr. Kiggins signed a lease with the HTHA for a unit in Rohrer Towers. (Doc. 1, "Compl." ¶23; Doc. 28-2, "Defs. Statement" ¶3.) After living in Rohrer Towers for four years, Mr. Kiggins began complaining internally to Defendants about unsanitary bathroom conditions, vermin, and issues with management. (Compl. ¶26.) At some point in 2010, Mr. Kiggins began expressing his concerns about Rohrer Towers publicly. In October 2010, Mr. Kiggins contacted several New Jersey senators and congressmen about Rohrer Towers "poor management" and requested that the apartment be inspected. (Doc. 33-2, Ex. B.) In December 2010, Mr. Kiggins then contacted HUD to complain about Rohrer Towers and the HTHA. (Doc. 33-1, Ex. A.) Mr. Kiggins also contacted a local journalist, who wrote an article about the ongoing issues between Mr. Kiggins and Rohrer Towers. (Doc. 33-7, Ex. G.) Mr. Kiggins also complained to the Haddon Township Police Department. (Doc. 32, "Pls. Statement" ¶20.)

The undisputed record shows that the HTHA had frequent issues with Mr. Kiggins as a tenant. Throughout his tenancy, the HTHA sent numerous letters to Mr. Kiggins reminding him that his lease prohibited activities that disturbed the "livability of the premises," and that disruptive activities were grounds for eviction based on N.J.S.A. 2A:18-61.1(b). The HTHA issued the first such notice on July 7, 2010. (Doc. 33-3, Ex. C.) The HTHA sent Mr. Kiggins a Notice to Cease after he allegedly "acted in a verbally abusive, hostile[,] and menacing manner towards the staff" and "expressed . . . intent or desire to 'get rid' of the Executive Director." (*Id.*) Despite receiving this Notice, Mr. Kiggins continued to engage in disruptive activities, and in December 2010, the police were called in connection with Mr. Kiggins' actions. (Doc. 33-4, Ex. D.) In May 2011, the HTHA again issued a Notice to Cease harassing and threatening behavior (*Id.*) After these warnings, Defendants first issued a Notice to Quit and Demand for Possession of the apartment

unit on July 26, 2011. (Doc. 33-5, Ex. E.) Based on the submitted evidence, this appears to be the first time that Defendants requested Mr. Kiggins to vacate the premises.

It is unclear from the record precisely what happened after the first Notice to Quit, however Mr. Kiggins remained living at Rohrer Towers. In 2015, the HTHA again began Notices to Cease and Notices to Quit to Mr. Kiggins. In January 2015, the HTHA issued a Notice to Cease (Doc. 33-17, Ex. Q), which documented a physical altercation between Mr. Kiggins and another tenant. In April 2015, the HTHA issued a Notice to Quit, stating that Mr. Kiggins had continued to violate the lease provisions by acting aggressively towards female tenants and management, causing them to fear for their safety. (Doc. 33-18, Ex. R.) In April 2016, the HTHA again issued a Notice to Quit and Demand for Possession, noting that Mr. Kiggins violated the lease by "aggressively shut[ting] the mailroom door twice on [Defendant] Coyne[.]" (Doc. 33-20, Ex. T.)

Following these Notices, the HTHA for the first time initiated formal landlord tenant eviction proceedings against Mr. Kiggins on June 30, 2016, in the Superior Court of New Jersey. (Defs. Statement ¶32.) Mr. Kiggins and the HTHA entered into a Consent Order to end the landlord tenant evictions proceedings. Pursuant to the Order, Mr. Kiggins agreed to "obey the rules and regulations of the landlord," and if not, the "landlord could apply for a judgment for possession and a warrant of removal[.]" (Defs. Statement ¶33.) The Consent Order expired after several months.

After the Consent Order expired, Mr. Kiggins began violating the lease again. In January 2017, the HTHA issued a Notice to Cease after Mr. Kiggins "stalked the Executive Director" and used expletives towards apartment management. (Doc. 33-21, Ex. U.) In February 2017, HTHA issued a Notice to Quit and Demand for Possession after Mr. Kiggins submitted his rental check with a note saying, "KEEP PLAYING WITH ME AND YOU WILL GET HURT." (Doc. 33-24,

3

Ex. X.) Following these incidents, on March 23, 2017, the HTHA filed a second landlord tenant eviction proceeding against Mr. Kiggins in the Superior Court of New Jersey. (Defs. Statement ¶34.) In these proceedings, the trial judge ruled in favor of the HTHA. (Doc. 28-5.) However, on appeal, the Appellate Division reversed because the landlord tenant complaint "failed to include language required under HUD regulations" such as "the availability of grievance and arbitration procedures[.]" (Defs. Statements ¶41.) Accordingly, the eviction proceedings halted.

Mr. Kiggins remained living in Rohrer Towers and further issues arose. In January 2019, the HTHA sought repayment for damages after Mr. Kiggins caused a glass door to the apartment complex to crack and "become non-operational." (Doc. 33-27, Ex. AA.) The record evidence also establishes that, at some point, Mr. Kiggins, started to fall behind in rent. In February 2019, the HTHA attempted to terminate the Lease Agreement and noted that Mr. Kiggins owed $6,881.00, which "consist[ed] of overdue rent payments of $4,814." (Doc. 33-28, Ex. BB.) The HTHA again instituted landlord tenant eviction proceedings in state court. (Defs. Statement ¶43.) The eviction court granted the HTHA judgment for possession and issued a warrant of removal. (Defs. Statement ¶44.)

The record evidence demonstrates throughout the relevant time, Mr. Kiggins had ongoing issues with several residents of Rohrer Towers, known as the "Goon Squad." (Doc. 33-6, Ex. F; Doc. 33-9, Ex. I; Doc. 33-11, Ex. K). Mr. Kiggins believed that Rohrer Towers was behind the Goon Squad's harassment. (Doc. 28-2, Ex. 2). However, beyond Mr. Kiggins' belief, no record evidence indicates that the HTHA or any Defendant was involved in any issues involving other tenants. (Defs. Statement ¶15.)

Based on the events described above, Mr. Kiggins brought the present suit, alleging causes of action under Section 1983 for (1) violation of his First Amendment rights and (2) violation of

his Fourth Amendment rights. As to the First Amendment claim, Mr. Kiggins argues that the HTHA retaliated against him by initiating eviction proceedings after he vocalized his concerns with the HTHA to public officials. As to the Fourth Amendment claim, Mr. Kiggins alleges that Defendants violated his Fourth Amendment rights by entering his unit, unannounced. (Compl. ¶34.) Mr. Kiggins alleges that this amounted to an unreasonable search and seizure in violation of the Fourth Amendment. (*Id.*) However, Mr. Kiggins concedes that the "[l]ease permits HTHA as the landlord to have access to Mr. Kiggins' apartment for purposes of 'making reasonable repairs, conducting periodic inspections, and providing extermination services[.]" (Defs. Statement ¶46.) Mr. Kiggins also agrees that the HTHA had always given Mr. Kiggins written notice when it sought to enter his apartment. (Defs. Statement ¶48.)

## II.     LEGAL STANDARD

### A.  Motion for Summary Judgment

The court should grant a motion for summary judgment when the moving party "shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "material" to the dispute if it could alter the outcome, and a dispute of a material fact is "genuine" if "a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Matsushida Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'") (quoting *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 289 (1968)). In deciding whether there is any genuine issue for trial, the court is not to weigh evidence or decide issues of fact. *Anderson*, 477 U.S. at 248. Because fact and credibility

5

determinations are for the jury, the non-moving party's evidence is to be believed and ambiguities construed in his favor. *Id*. at 255; *Matsushida*, 475 U.S. at 587.

Although the movant bears the burden of demonstrating that there is no genuine issue of material fact, the non-movant likewise must present more than mere allegations or denials to successfully oppose summary judgment. *Anderson*, 477 U.S. at 256. The nonmoving party must at least present probative evidence from which a jury might return a verdict in his favor. *Id.* at 257. The movant is entitled to summary judgment where the non-moving party fails to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### B. Section 1983 Standard

42 U.S.C. § 1983 allows a plaintiff to bring a private cause of action for certain violations of his constitutional rights. Section 1983 provides in relevant part the following:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

In order to recover under section 1983, a plaintiff must prove two elements: (1) "the violation of a right secured by the Constitution or laws of the United States"; and (2) "the alleged deprivation was committed or caused by a person acting under color of state law." *Renwick v. U.C. Med. Dept.*, No. 10-6272, 2011 WL 1883810, at * (D.N.J. May 11, 2011) (citing *West v. Atkins*, 487 U.S. 42, 48 (1988)).

### III. DISCUSSION

Defendants argue that they are entitled to summary judgment for the following reasons: (1) Mr. Kiggins cannot establish a First Amendment violation; (2) Mr. Kiggins cannot establish a

Fourth Amendment violation; and (3) there is no basis for liability against the "Individual Defendants." The Court addresses each argument in turn.[1]

### A. First Amendment Claim

Mr. Kiggins alleges that Defendants retaliated against him for exercising his First Amendment rights. To state a claim for retaliation based on the First Amendment, a plaintiff must prove (1) constitutionally protected conduct; (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights; and (3) a causal link between the constitutionally protected conduct and the retaliatory action. *Thomas v. Independence Twp.*, 463 F.3d 285, 296 (3d Cir. 2006) (citing *Mitchell v. Horn,* 318 F.3d 523, 530 (3d Cir. 2003)).

Mr. Kiggins has undoubtedly proven the first element of the test—that he engaged in constitutionally protected activity. The Third Circuit has held that formal grievances directed at public officials qualify as protected activity under the Petition Clause of the First Amendment. *Brennan v. Norton,* 350 F.3d 399, 417 (3d Cir. 2003). There is no dispute that Mr. Kiggins frequently vocalized his concerns with the HTHA and Rohrer Towers to politicians, HUD, and the HTHA itself. (Doc. 33-2, Ex. B) (October 25, 2010 email from Mr. Kiggins to politicians describing his complaints with Rohrer Towers); (Doc. 33-7, Ex. G) (news article in which Mr. Kiggins discusses Rohrer Towers). Similarly, the second prong of the test is not in dispute. Courts have held that a "retaliatory eviction of a tenant under color of state law is actionable under 42

---

[1] Mr. Kiggins argues that the Motion should be denied as untimely because Defendants filed this Motion more than thirty days after the close of discovery. (Opp. at 3.) However, the Amended Scheduling Order entered in this case clearly sets the deadline to file dispositive motions as August 15, 2019. (Doc. 17.) Judge Schneider then granted Defendants an extension of time to file, postponing the deadline to file dispositive motions until September 15, 2019. (Doc. 19.) Because September 15 fell on a Sunday, Defendants filed their initial Motion on September 16, 2019. (Doc. 21.) On March 18, 2020, the Court denied this Motion, without prejudice, due to procedural defects and granted Defendants the opportunity to refile. (Doc. 27.) Defendants refiled the Motion on March 24, 2020. (Doc. 28.) Accordingly, the Court finds that the Motion was timely filed.

U.S.C. § 1983." *Walton v. Darby Town Houses, Inc.*, 395 F. Supp. 553, 559 (E.D. Pa. 1975) (citing *Lavoie v. Bidwood*, 457 F.2d 7 (1st Cir. 1972)). There is no dispute that Defendants have attempted to evict Mr. Kiggins from Rohrer Towers on at least three separate occasions. Therefore, the heart of the dispute here is the causation element—whether the Defendants' eviction attempts were motivated by Mr. Kiggins' protected speech.

To establish a causal link, a plaintiff must establish either an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action or a pattern of antagonism coupled with timing. *Kaszuba v. Borough of Dickson City*, 779 F. App'x 980, 983–84 (3d Cir. 2019) (quoting *Lauren W. ex rel. Jean W. v. DeFlaminis,* 480 F.3d 259, 267 (3d Cir. 2007)). "In the absence of that proof the plaintiff must show that from 'the evidence gleaned from the record as a whole' the trier of the fact should infer causation." *Id.* (quoting *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 281 (3d Cir. 2000)). The "mere fact that [an adverse action] occurs after a complaint will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events." *Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1302 (3d Cir. 1997).

Defendants assert that summary judgment is warranted on the causation element for two reasons. First, Defendants argue that the timing of the alleged retaliation does not support causation. (Mot. at 4.) Defendants argue that "Kiggins has been making complaints about Rohrer Tower since 2010 to anyone willing to listen to him[.]" (Mot. at 5.) However, the "alleged retaliation—the filing of landlord tenant actions—did not occur until 2016, some six years later." (*Id.*) Therefore, Defendants argue that the "gap of six years between Kiggins' protected activity and the supposed retaliatory landlord tenant actions cannot establish causation." (*Id.*)

The Court recognizes that a very close temporal proximity can sometimes establish a causal link *if it is unusually suggestive. See Krouse v. American Sterilizer Co.,* 126 F.3d 494, 503 (3d Cir.1997) ("Even if timing alone could ever be sufficient to establish a causal link, we believe that the timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred.") (citing *Jalil v. Avdel Corp.,* 873 F.2d 701, 708 (3d Cir.1989) (finding causation based solely on temporal proximity when an employee was discharged two days after the filing of an EEOC complaint)). However, "the mere passage of time is not legally conclusive proof against retaliation." *Id.* In the absence of temporal proximity, courts may examine the "intervening period for other evidence of retaliatory animus." *Id.* at 503–04; *see also Robinson v. Southeastern Pa. Transp. Auth.,* 982 F.2d 892, 894 (3d Cir.1993) ("The temporal proximity noted in other cases is missing here and we might be hard pressed to uphold the trial judge's finding [of causal link] were it not for the intervening pattern of antagonism that SEPTA demonstrated.").

Here, it is undisputed that Defendants did not file a formal landlord tenant action to evict Mr. Kiggins until 2016. (Defs. Statement ¶32.) But the record evidence establishes that Defendants sent letters to Mr. Kiggins suggesting that he would be evicted as early as 2011. (*See* Doc. 33-5, Ex. E.) Mr. Kiggins began vocalizing his concerns about Rohrer Towers in 2010. (*See* Compl. ¶26; Doc. 33-2, Ex. B (letter to government officials); Doc. 33-1, Ex. A (complaint to HUD); Doc. 33-7, Ex. G (newspaper article documenting complaints)). Accordingly, there appears to be a one-year gap between the protected activity and the alleged retaliatory conduct. This one-year gap does not conclusively establish a finding of retaliatory motive or a lack of retaliatory motive. *See, e.g.*, *Jalil*, 873 F.2d at 708. This is a closer factual question, one that would be inappropriate for the Court to determine at the summary judgment stage. Thus, the Court cannot grant summary judgment on these grounds.

However, Defendants also argue that Mr. Kiggins cannot prove causation because Defendants would have nevertheless initiated eviction proceedings against Mr. Kiggins even if he had not publicly complained about Rohrer Towers. (Mot. at 8.) The Court finds this argument persuasive. The Third Circuit has held that a defendant may defeat a retaliation claim at summary judgment by showing that it would have taken the same action even if the plaintiff had not engaged in the protected activity. *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007).

For example, in *Greer v. Mehiel*, a plaintiff sued his landlord after his landlord attempted to evict him, alleging that this eviction was retaliation in violation of the First Amendment. 2018 WL 1626345, at *4–5 (S.D.N.Y. Mar. 29, 2018). The plaintiff maintained an online blog in which he posted negative statements about the apartment. *Id.* The landlord moved for summary judgment, arguing that it would have taken the same action—eviction—even if the plaintiff had not created such a blog. *Id.* The undisputed evidence demonstrated that the plaintiff did not consistently pay his rent on time and engaged in antagonistic behavior towards other residents. *Id.* Accordingly, the court found that summary judgment was warranted because the defendant sufficiently demonstrated that it would have taken the same actions, even absent the protected activity. *Id.* at 6–7.

Similarly, in evaluating the undisputed facts here, Mr. Kiggins' evidence in support of his argument that Defendants' eviction attempts were motivated by retaliation is speculative, at best. Although there is evidence that Mr. Kiggins made complaints about the HTHA and Rohrer Towers, there is no evidence in the record that Defendants wanted to harm Mr. Kiggins *because of* Mr. Kiggins' speech. Rather, the undisputed record demonstrates that Defendants would have evicted Mr. Kiggins even in the absence of such speech.

Defendants sent, at minimum, four Notices to Cease—notifying Mr. Kiggins that his behavior had violated the lease provision prohibiting residents from disturbing the livability of the premises—and three Notices to Quit before initiating formal eviction proceedings. (*See* Doc. 33-3, Ex. C; Doc. 33-4, Ex. D; Doc. 33-5, Ex. E; Doc. 33-17, Ex. Q; Doc. 33-18, Ex. R; Doc. 33-20, Ex. T; Doc. 33-21, Ex. U.) The HTHA gave Mr. Kiggins numerous opportunities to cease his disruptive behavior before issuing a Notice to Quit and before instituting formal landlord tenant proceedings. Mr. Kiggins was accused of engaging in threatening and abusive behavior towards other residents. (*See, e.g.*, Doc. 33-3, Ex. C (July 7, 2010 letter requesting Mr. Kiggins to stop engaging in verbally hostile and abusive manner towards staff); Doc. 33-18, Ex. R (April 2015 letter notifying Mr. Kiggins had violated the lease by acting aggressively towards female tenants.)) Mr. Kiggins was also accused of engaging in physical altercations with other residents. (*See e.g.*, Doc. 33-17, Ex. Q (January 2015 letter documenting physical altercation.)) Further, Mr. Kiggins was accused of shutting the mailroom door on an apartment manager (Doc. 33-20, Ex. T (March 9, 2016 letter notifying Mr. Kiggins of termination of his lease after he forcibly shut door on apartment management)) and shattering a glass door to the apartment complex (Doc. 33-27, Ex. AA). Additionally, Mr. Kiggins submitted a rent check to apartment management with threatening language on it. (Ex. X. (February 23, 2017 letter notifying Mr. Kiggins of lease termination after he submitted rental check with note saying, "KEEP PLAYING WITH ME AND YOU WILL GET HURT.")) Mr. Kiggins also refused to verify his income requirements, as required by HUD, and he fell behind in rent payments. (Doc. 33-28, Ex. BB.)

In sum, the available evidence, in particular that submitted by Mr. Kiggins himself, establishes that Mr. Kiggins was a difficult tenant. He received numerous warnings and nevertheless consistently engaged in disruptive conduct, in violation of his lease agreement. Thus,

even taken in the light most favorable to Mr. Kiggins, the evidence supports a conclusion that Defendants would have evicted Mr. Kiggins based on his disruptive conduct regardless of whether Mr. Kiggins had ever publicly vocalized his complaints about Rohrer Towers. In other words, Defendants have proven that they would have taken the same adverse action in the absence of the protected speech. Despite Mr. Kiggins' arguments to the contrary, there is no evidence beyond mere speculation that Mr. Kiggins' speech motivated Defendants to initiate eviction proceedings against Mr. Kiggins. No reasonable jury could conclude otherwise. Without such evidence, there cannot be a finding of retaliation.

Because Mr. Kiggins cannot establish that Defendants retaliated against him in violation of the First Amendment, Mr. Kiggins cannot prove that a constitutional violation has occurred. Because proof of a constitutional violation is a necessary part of a section 1983 claim and Mr. Kiggins has failed to provide such proof, summary judgment on this cause of action for Defendants is appropriate.

### B. Fourth Amendment Section 1983 Claim

In his Complaint, Mr. Kiggins additionally asserts that Defendants are liable for violating his Fourth Amendment right to be free from unreasonable searches. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. Amend. IV. "[S]earches and seizures inside a home without a warrant are presumptively unreasonable." *Welsh v. Wisconsin,* 466 U.S. 740, 748–49 (1984). However, a well-established exception to this principle is consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).

In accordance with the consent exception, courts generally have found that inspection of rental units in compliance with a signed lease and HUD regulations are not Fourth Amendment

violations. *See, e.g.*, *Echemendia v. Gene B. Glick Mgmt. Corp.*, 263 F. App'x 479, 482–83 (7th Cir. 2008) ("[T]he evidence shows that they entered only because HUD regulations required an annual inspection, and she had agreed to this in her lease and her application for HUD funds. Their entry would have been a consensual encounter, which would not violate the Fourth Amendment.") (internal citation omitted); *Kendall v. Oxford Hous. Auth.*, No. 3:93CV124, 1994 WL 1890896, at *2 (N.D. Miss. Nov. 25, 1994) (rejecting Fourth Amendment claim and stating: "In making this agreement [in which lease provided for entry for inspection and making repairs] and accepting public housing, plaintiff waived any objections she may have had to the home inspections, and as the 'choice [was] entirely hers,' regarding acceptance of these terms, 'nothing of constitutional magnitude is involved.' ") (quoting *Wyman v. James,* 400 U.S. 309, 324 (1971)); *Evans v. Lucas Met. Housing Auth.*, No. 3:15 CV 389, 2016 WL 7407539, at *6 (N.D. Ohio Dec. 22, 2016) (similar).

With regards to Mr. Kiggins' claim, the following essential facts are undisputed. Mr. Kiggins entered into a lease agreement with the HTHA. (Compl. ¶3.) The lease agreement permitted the HTHA, as landlord, to have access to Mr. Kiggins' apartment for purposes of "making reasonable repairs, conducting periodic inspections, and providing extermination services." (Defs. Statement ¶46.) The HTHA did seek access to tenants' apartments for the purposes enumerated in the lease. (*Id.* ¶47.) Each time, the HTHA, gave Mr. Kiggins written notice to enter his apartment. (*Id.* ¶48.) Mr. Kiggins does not dispute any of these facts. Mr. Kiggins does not offer any evidence that Defendants accessed his property in an unauthorized manner. Moreover, it seems that Mr. Kiggins has abandoned his Fourth Amendment claim. Nowhere in Mr. Kiggins' Opposition Brief, Statement of Material Facts, and Certification is there mention of any unauthorized entrance or search of Mr. Kiggins' unit.

As such, the undisputed facts establish that Mr. Kiggins signed a lease consenting to inspections, and based on the evidence presented, no search occurred that would violate Mr. Kiggins' Fourth Amendment rights. As such, the Court finds there is no genuine issue of material fact as to whether Mr. Kiggins' Fourth Amendment rights were violated. Because proof of a constitutional violation is a necessary part of a Section 1983 claim and Mr. Kiggins has failed to provide such proof, summary judgment for Defendants is appropriate.[2]

## IV. CONCLUSION

For the reasons contained herein, Defendants' Second Motion for Summary Judgment (Doc. 28) is **GRANTED**. An accompanying Order shall issue.


Dated: 12/4/2020                                                  /s/ Robert B. Kugler
                                                                               ROBERT B. KUGLER
                                                                               United States District Judge

---

[2] Defendants also argue that the Court should grant summary judgment on the claims against the Individual Defendants. However, because the Court has already granted summary judgment in favor of Defendants on Mr. Kiggins' remaining claims, there is no need to address the liability of the Individual Defendants.